UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

GEORGE ARMSTRONG,

    Defendant.
------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 09 2016 ★

BROOKLYN OFFICE

11-cr-681

**OPINION AND ORDER**

    The New York Daily News (the "Daily News") requests that I unseal two letters filed by the government in connection with the sentencing of George Armstrong. Both the government and the defendant seek to keep the letters sealed. For the reasons below, I deny the Daily News' request and order that the letters remain sealed.

**I.    Background**

    On October 21, 2015, I sentenced George Armstrong to five years of probation for racketeering, mail fraud, and money laundering related to a bribery scheme operating through the New York City Department of Housing Preservation and Development ("HPD"). Armstrong had pleaded guilty to those charges in October of 2011. Both before and after his guilty plea, Armstrong offered substantial assistance to the government as it investigated and prosecuted other participants in the scheme.

    Armstrong has received threats as a result of his cooperation, some of which were discussed at his sentencing, and the more recent of which are detailed in the parties' sealed letters submitted in response to the Daily News' application.[1] As early as 2011, there was some

---

[1] The reasoning in those letters is set out in this opinion; however the letters themselves will remain under seal, as they discuss personal details about Armstrong in the context of describing threats to him, and publication of those details might compromise both his and his family's safety and privacy. *See Matter of New York Times Co.*, 828 F.2d 110, 115-16 (2d Cir. 1987).

media speculation that Armstrong was a government cooperator. Official confirmation of Armstrong's cooperation came during the trial of Stevenson Dunn, Lee Hymowitz, and Michael Freeman (the "Dunn trial"), who had been charged with participating in aspects of the same HPD bribery scheme as Armstrong. The Dunn trial spanned 13 days in March and April of 2014. Although Armstrong did not testify, during that trial the nature and extent of Armstrong's role in criminal conduct related to the HPD scheme and his cooperation with the government were discussed by others in open court. Similarly, during Armstrong's sentencing, held in open court, his cooperation was discussed in significant detail. At that sentencing, I described at length the reasoning behind my decision to sentence Armstrong to five years' probation.

## II. Discussion

### A. Qualified First Amendment Right to Access

The expressly guaranteed freedoms of the First Amendment "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (quotations omitted). These express freedoms imply that the press and the general public have a qualified First Amendment right to attend criminal trials, so that the "constitutionally protected discussion of government affairs is an informed one." *Id.* at 604-05; *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575-77 (1980). The qualified First Amendment right of access to criminal trials encompasses a qualified right to attend sentencing proceedings. *United States v. Alcantara*, 396 F.3d 189, 199 (2d Cir. 2005).

Open proceedings "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system" by "assur[ing] that established procedures are being followed and that deviations will become known." *Press-*

*Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise*"). Access to sentencing proceedings allows the public to understand the reasons behind a given sentence, a value reflected in 18 U.S.C. § 3553(c), which states that sentencing shall be held in open court, in part to "enable the public to learn why defendant received a particular sentence." *Alcantara*, 396 F.3d at 206 (quotations omitted). Open sentencing proceedings are a safeguard against corruption, provide "community therapeutic value," and offer an opportunity for the public to see and reflect upon the "effect of laws that expand or contract the discretion of judges in imposing sentences." *Id.* at 198-99 (quotations omitted).

The public also has a qualified First Amendment right to access judicial documents if they are "derived from or are a necessary corollary of the capacity to attend [] proceedings," or if "logic and experience" support such access—that is, if access "plays a significant positive role in the functioning of the particular process in question" and the documents "have historically been open to the press or general public." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92-93 (2d Cir. 2004) (quotations omitted) (finding a qualified First Amendment right to access criminal docket sheets); *see also United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (discussing common law presumption of access to documents concerning cooperation and noting that, "[w]here filing with the court is unusual or is generally under seal," presumption of access is weaker).

The Daily News asserts that "sentencing memos are universally filed publicly in the spirit of transparency that is the bedrock of the U.S. court system." This is simply incorrect; whether or not they are later subject to unsealing, sentencing memoranda that implicate cooperation are often filed under seal. As noted in a recent national survey of district judges, U.S. Attorney's

Offices, federal defenders, Criminal Justice Act district panel representative's offices, and chief probation and pretrial services offices:

> "The most common action taken by the district courts [to protect cooperators] has been, at the request of parties, to seal documents containing cooperation information[.] . . . Nearly half of the respondents also reported that their district seals, *sua sponte*, documents containing cooperation information[.]")

Margaret S. Williams, Donna Stienstra, Marvin Astrada, Fed. Judicial Ctr., *Survey of Harm to Cooperators* 27 (2016) ("*Survey of Harm to Cooperators*"). Whether or not the government's letters in this case are a "necessary corollary" of the right to attend sentencing proceedings, "logic and experience" do not dictate access to them.

Nevertheless, I assume for the purposes of my analysis here that a First Amendment presumption of access applies to the government's letters. The Second Circuit has not explicitly established whether such a presumption applies to sentencing memoranda or to government applications under § 5K1.1 of the Sentencing Guidelines for the consideration of cooperation in sentencing, but courts in this district, considering similar requests, have found such presumption. *See e.g. United States v. Nafis*, 2013 U.S. Dist. LEXIS 134399, *3 (E.D.N.Y. Sept. 19, 2013).[2]

The qualified First Amendment right of access should be abridged only where there is a higher value or compelling interest that will be significantly harmed by public access and the sealing is narrowly tailored to protect that interest. *Globe Newspaper*, 457 U.S. at 606-07; *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008). The more extensive a request for sealing,

---

[2] On occasion, courts in the Second Circuit have analyzed documents submitted in connection with sentencing as subject to a common law, rather than a First Amendment, presumption of access. However, in those cases, the court did not actually rely on the documents at issue in determining the sentence. *See e.g. United States v. Tangorra*, 542 F. Supp. 2d 233, 237 (E.D.N.Y. 2008). Here, I relied on information in the government's letters in determining Armstrong's sentence, and so I apply a First Amendment analysis. Because I find that the letters should not be unsealed even under the robust First Amendment presumption, there is no need to engage in the similar, though less searching, common law analysis.

4

"the greater must be the gravity of the required interest and the likelihood of risk to that interest" to justify it. *United States v. Zazi*, 2010 WL 2710605, at *2 (E.D.N.Y. June 30, 2010) (*quoting Ayala v. Speckard*, 131 F.3d. 62, 70 (2d Cir. 1997)).

### 1. Compelling Interest in Maintaining Documents Under Seal

Here, the government and defendant both oppose unsealing the government's sentencing letters on the ground that unsealing will expose defendant to an increased risk of threats, harassment, or violence.[3] The government further opposes unsealing the sentencing letters on the ground that unsealing will hinder future efforts to obtain cooperation from similarly situated defendants.

The safety of a cooperating defendant can constitute a compelling interest that may be weighed against a First Amendment presumption of access. *See e.g. United States v. Key*, 2010 WL 3724358, at *2 (E.D.N.Y. Sept. 15, 2010). It is clear that Armstrong's cooperation has exposed him to significant risks, but it is not clear that unsealing the letters at issue, which contain information that is already public, would create any *additional* risks.

More persuasive is the government's argument that unsealing the letters will damage its ability to secure cooperation from defendants now and in the future. Unquestionably, there is a government interest in the secrecy of *ongoing* investigations. *See e.g. United States v. Smith*, 985 F. Supp. 2d 506, 531 (S.D.N.Y. 2013). However, we must engage in a broader inquiry here: the government retains a unique interest in keeping documents relating to cooperation under seal even after a given investigation is completed. If we limit the government interest in protecting

---

[3] To the extent the government and defense's argument is that unsealing the letters will increase the risk of harm to Armstrong because they will confirm what had previously been mere press speculation, I reject it. Armstrong's cooperation, having been discussed extensively in open court many times, is not speculative. *See Zazi*, 2010 WL 2710605, at *4 (rejecting government's argument that harm would result from confirmation of media reports of cooperation where "all reasonable inferences" pointed to cooperation).

documents to a narrow interest in the secrecy of ongoing investigations, we fail to acknowledge how profoundly the federal criminal justice system relies on cooperators. As the Second Circuit has recognized, where release of information "is likely to cause persons in the particular *or future* cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." *Amodeo*, 71 F.3d at 1050 (emphasis added); *see also* Order to Show Cause at 3-4, *In re Motion for Civil Contempt by John Doe*, 16-mc-0706 (E.D.N.Y. March 14, 2016) (noting a unique interest in maintaining documents regarding cooperation even after an investigation ends in order not to "hinder the Government's efforts to obtain future cooperation from others"); *cf. Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979) (discussing secrecy of grand jury proceedings and explaining that the court should consider not only the "immediate effects" of disclosure but also its possible effect on the general functioning of the grand jury system in the future).

The central role of cooperation in the federal criminal justice system is evident from the federal statute and Sentencing Guidelines which permit the court to impose sentences below the mandatory minimums for cooperators. 18 U.S.C.A. § 3553(e); United States Sentencing Commission, *Guidelines Manual* §5K1.1 (2015). No other mitigating factor receives that level of deference. This sentencing policy achieves two goals—it gives the government leverage to investigate and prosecute the conspiracies that the federal criminal justice system targets, and it gives the court a means of acknowledging the cooperating defendant's contribution to the administration of justice, often at substantial risk to himself.

The threats Armstrong experienced were not exceptional. Harm to cooperating defendants is distressingly, if not surprisingly, routine. *See generally Survey of Harm to Cooperators, supra.* A potential cooperator must weigh the possibility of a reduced sentence

against a very real risk of harm to himself and his loved ones.[4] *See Id.* at 17. Many defendants refuse to cooperate because of these risks; others withdraw their cooperation. *Id.* at 23-25.

For this reason, the government's ability to secure current and future cooperation from defendants depends on the government's ability to convince them to accept some risk, and on its ability to minimize this risk where it can. To this end, the government must be able to represent to cooperators that it can and will make efforts to keep the nature and scope of cooperation confidential. Of course, a cooperator's identity may emerge at trial, if one occurs, or at sentencing, as it did here. *Id.* at 12. It may be gleaned from the appearance of sealed entries on the docket sheet. *Id.* at 9. Nonetheless, the government should be able to make a good-faith representation to a cooperator, at the time cooperation is initiated, that it will take reasonable efforts to protect him from retaliation. It cannot make this representation if it believes the court will routinely unseal government submissions detailing cooperation upon a third-party request once the proceedings have concluded.

### 2. Sealing is Narrowly Tailored to Protect a Compelling Interest

In this case, substantially all of the information contained in the government's sentencing letters is a matter of public record, having been discussed at Armstrong's sentencing and at the Dunn trial. Other judges, faced with similar facts, have found that, where information regarding a cooperator is already public in some form, the government interest in protecting any materials containing that information disappears, and the public's right to access necessarily prevails. *See e.g. United States v. Huntley*, 943 F. Supp. 2d 383, 387 (E.D.N.Y. 2013); *In re Application to Unseal*, 891 F. Supp. 2d 296, 300 (E.D.N.Y. 2012); *Key*, 2010 WL 3724358, at *2-3.

---

[4] Nor is a reduced sentence guaranteed—in order to "substantially assist" the government, a cooperator may have to reveal criminal activities that were previously unknown to the government, exposing himself to a higher sentence if the government withdraws its support, or if the court chooses not to weigh his cooperation heavily at sentencing.

In my view, however, while alternate sources of information lessen the government interest in secrecy, they also diminish the urgency of the public's need for the sealed materials. "[T]o the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that [the] constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper*, 457 U.S. at 604-05 (quotations omitted). Where, therefore, the public can have a fully informed discussion based on "information, often (as here) quite extensive, disclosed during an open sentencing hearing," unsealing duplicative documents does not significantly further the public's interest in information. *United Staftes v. Corbitt*, 879 F.2d 224, 240 (7th Cir. 1989) (approving the sealing of presentence reports). Here, the open proceedings, including an open discussion of the factors I considered in determining Armstrong's sentence, enabled the public to learn the reasons behind that sentence and met the important public interests in access to sentencing proceedings articulated in *Alcantara*.[5] In particular, maintaining the government's letters under seal will not disturb "the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Alcantara*, 396 F.3d at 195 (*quoting Press-Enterprise*, 464 U.S. at 508). In fact, where cooperators' candid

---

[5] The facts here contrast with the facts before the Second Circuit in *Alcantara*. In that case, the Second Circuit determined there was a public right to witness sentencing proceedings, not simply to review a transcript of those proceedings, and that that right was violated where the proceedings were conducted in the district judge's robing room. *Alcantara*, 396 F.3d at 191-92. As a preliminary matter, the district court's decision in *Alcantara* to hold sentencing proceedings in the robing room was found to be arbitrary, unsupported by any articulated government interest, let alone a compelling one. *Id.* at 201. Furthermore, as the Circuit explained, "the ability to see and to hear a proceeding as [it] unfolds is a vital component of the First Amendment right of access—not, as the government describes, an incremental benefit . . . a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript." *Id.* at 201-202 (quotations omitted). Here, the public had access to trial and sentencing proceedings in which Armstrong's cooperation was discussed and can obtain transcripts of those proceedings.

participation, offered at risk to themselves, is central to the administration of justice, it is fair, and appears fair, for courts to acknowledge and weigh heavily the government's attempts to protect those cooperators.

A nominal public interest in access might prevail where the only countervailing government interest is in the secrecy of information that is no longer actually secret. Here, however, the government has an interest in demonstrating institutional support for cooperators that is distinct from, and survives beyond, its interest in secrecy. Under the particular facts of this case, limited sealing, i.e., the sealing of the two government letters, is a narrowly tailored means of protecting this compelling interest.

### III. Conclusion

For the foregoing reasons, the Daily News' application to unseal the letters submitted by the government relating to George Armstrong's sentencing at Docket Numbers 12 and 15 is denied. The above referenced materials shall remain sealed.

SO ORDERED.

/s/ Nina Gershon
NINA GERSHON
United States District Judge

Dated: May 9, 2016
Brooklyn, New York